

2000 Decisions

5-5-2000

# Gallas v. Supreme Court of Pennsylvania, et al.

Precedential or Non-Precedential:

Docket 98-2138

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Gallas v. Supreme Court of Pennsylvania, et al." (2000). *2000 Decisions*. Paper 91.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/91

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 5, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-2138

GEOFF GALLAS

v.

THE SUPREME COURT OF PENNSYLVANIA; THE FIRST
JUDICIAL DISTRICT OF PENNSYLVANIA; DEMOCRATIC
CITY COMMITTEE; THE PHILADELPHIA CHAPTER OF
THE TEAMSTERS UNION TEAMSTERS LOCAL 115; DOES
1-100; ROBERT N.C. NIX, JR., HONORABLE, in his
official capacity as CHIEF JUSTICE, SUPREME COURT
OF PENNSYLVANIA; JOHN P. FLAHERTY, JR.,
HONORABLE, in his official capacity as JUSTICE OF THE
SUPREME COURT OF PENNSYLVANIA; STEPHEN A.
ZAPPALA, HONORABLE, individually and in his official
capacity as JUSTICE OF THE SUPREME COURT OF
PENNSYLVANIA; RALPH J. CAPPY, HONORABLE,
individually and in his official capacity as JUSTICE OF
THE SUPREME COURT OF PENNSYLVANIA; RONALD D.
CASTILLE, HONORABLE, in his official capacity as
JUSTICE OF THE SUPREME COURT OF PENNSYLVANIA;
RUSSELL M. NIGRO, HONORABLE, individually and in
his official capacity as JUSTICE OF THE SUPREME
COURT OF PENNSYLVANIA; SANDRA SCHULTZ
NEWMAN, HONORABLE, in her official capacity as
JUSTICE OF THE SUPREME COURT OF PENNSYLVANIA;
NANCY SOBOLEVITCH, individually and in her official
capacity as COURT ADMINISTRATOR OF PENNSYLVANIA;
ALEX BONAVITACOLA, HONORABLE, individually and in
his official capacity as PRESIDENT JUDGE, COURT OF
COMMON PLEAS; ESTHER SYLVESTER, HONORABLE,
individually and in her official capacity as JUDGE,
COURT OF COMMON PLEAS FAMILY DIVISION; VINCENT
FUMO, HONORABLE, individually and in his official

        * Honorable Arthur L. Alarcon, Senior Judge of the United States Court
        of Appeals for the Ninth Circuit, sitting by designation.
capacity as PENNSYLVANIA STATE SENATOR; JOSEPH
DIPRIMIO, individually and in his official capacity as
DEPUTY COURT ADMINISTRATOR FAMILY DIVISION,
DOMESTIC RELATIONS BRANCH; ROBERT BRADY,
individually and in his official capacity as CHAIRMAN,
DEMOCRATIC CITY COMMITTEE; JOHN MORRIS,
individually and in his official capacity as Secretary–
Treasurer of Teamsters Local Union No. 115

        Geoff Gallas,

        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 96–06450)
District Judge: Honorable William H. Yohn, Jr.

Argued March 20, 2000

BEFORE: MANSMANN, GREENBERG, and
ALARCON,* Circuit Judges

(Filed: May 5, 2000)

        Glenn J. Brown
        246 West Broad Street
        Quakertown, PA 18951

        Peter G. Friesen (argued)
        656 Fifth Avenue, Suite F
        San Diego, CA 92101

         Attorneys for Appellant

2

William H. Lamb (argued)
William P. Mahon
Lamb, Windle & McErlane, P.C.
24 East Market Street
P.O. Box 565
West Chester, PA 19381-0565

 Attorneys for Appellees
Honorable Ralph J. Cappy,
Honorable Stephen A. Zappala,
Honorable Russell M. Nigro, and
Nancy Sobolevitch

Alan J. Davis (argued)
Burt M. Rublin
Ballard Spahr Andrews & Ingersoll,
LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599

 Attorneys for Appellee
Honorable Russell M. Nigro

James E. Beasley (argued)
David A. Yanoff
Beasley, Casey & Erbstein
1125 Walnut Street
Philadelphia, PA 19107-4997

 Attorneys for Appellees
The First Judicial District of
Pennsylvania,
Honorable Alex Bonavitacola,
Honorable Esther Sylvester,
and Joseph DiPrimio

Richard A. Sprague (argued)
Geoffrey R. Johnson
Sprague & Sprague
Suite 400, Wellington Building
135 South 19th Street
Philadelphia, PA 19103

 Attorneys for Appellee
Vincent J. Fumo

3

Gabriel L.I. Bevilacqua
Stephen M. Donweber
Saul, Ewing, Remick & Saul LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102

 Attorneys for Appellees
Robert Brady and the Democratic
City Committee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes on before this court on appeal from various orders of the district court dismissing appellant Geoff Gallas' claims arising under 42 U.S.C. 1983 and Pennsylvania common law. Gallas brought this action against various defendants, including the Pennsylvania Supreme Court and several of its justices, principally alleging that they terminated him from his position as Executive Administrator of the First Judicial District of Pennsylvania in violation of his constitutional rights and that court personnel unlawfully invaded his privacy when they publicly disclosed documents from domestic proceedings in which he was involved. The district court dismissed or granted the defendants summary judgment on each of Gallas' claims prior to trial. For the reasons we set forth herein, we will affirm.

A. Factual Background

On December 19, 1990, the Pennsylvania Supreme Court, reacting to budgetary and administrative problems in the Philadelphia courts which comprise the First Judicial District ("FJD"), issued an order assuming control over the FJD. J.A. at 304, 412. See In re Blake, 593 A.2d 1267, 1268 (Pa. 1991). Pursuant to the order, the court assigned, respectively, Justice Ralph Cappy the task of "overseeing

4

the reformation of the Administrative Structure of the Courts of the First Judicial District," and Justice Nicholas Papadakos the task of "overseeing the Budgetary Structure" of those courts. J.A. at 304. The Supreme Court, however, intended that its oversight of the FJD would be temporary, with control eventually returned to local judges and officials. J.A. at 413.

In the summer of 1991, a committee chaired by Justices James McDermott and Stephen Zappala of the Supreme Court conducted a search to select an Executive Administrator who would have the responsibility of "overseeing the administration of all ministerial functions" in the FJD's courts. J.A. at 415. This search resulted in Gallas' hiring for this position effective December 1, 1991. J.A. at 80, 415. According to Gallas' amended complaint, during the selection process Justices Zappala and Cappy and Nancy Sobolevitch, the Court Administrator of Pennsylvania, conveyed the importance of "instituting a `merit system' whereby employment and other issues in the FJD would be strictly governed by proper personnel processes, qualifications and performance"; these individuals further indicated to Gallas that "use of political patronage to fill positions in all three Philadelphia courts [Court of Common Pleas, Municipal Court, and Traffic Court] making up the FJD had been a serious problem in Philadelphia." J.A. at 85.

Gallas' complaint indicates that he "expressed concern and reticence about taking the job . . . [because] Philadelphia and its courts were vulnerable to improper political influence . . . [and] many persons, both inside and outside the FJD, previously derived improper benefit from that influence." J.A. at 85–86. This concern led Gallas to worry about job security, J.A. at 86, and prompted him to negotiate an oral "severance arrangement" which would entitle him to certain benefits if he should leave or be discharged. Supp. App. at 1206–11, 1214, 1708–17.

Gallas served as Executive Administrator for approximately four and one-half years. According to Gallas' complaint, during the course of his service various individuals pressured him to acquiesce in patronage appointments in the FJD. Gallas claims that in 1992

5

Justices Zappala and Cappy instructed him to accommodate job appointments favored by two public figures, Pennsylvania State Senator Vincent Fumo and Robert Brady,[1] the chairman of the Democratic City Committee. Gallas alleges that Zappala and Cappy specifically warned him that his failure to honor Fumo's requests could result in the loss of his job. J.A. at 87–88. Gallas further alleges that Fumo and Brady and their respective associates contacted him on multiple occasions concerning requests that certain individuals be hired or promoted. J.A. at 87–88. According to Gallas, he resisted demands for such appointments, and in March 1993, Fumo and Brady told him that his failure to honor their requests would lead them to "turn the dogs" on him. J.A. at 88. As the district court summarized, Gallas endured a "rocky" tenure as Executive Administrator during which he "attempted to walk a fine line between accommodating the personnel requests of local politicians and instituting objective, process-oriented standards for making personnel decisions." Gallas v. Supreme Court of Pa. , No. CIV. A. 96–6450, 1998 WL 22081, at *2 (E.D. Pa. Jan. 22, 1998).

Gallas' service as Executive Administrator came to an end pursuant to a March 26, 1996 order of the Pennsylvania Supreme Court (the "March 26 order") which provided for an "administrative reorganization of the First Judicial District." According to affidavits from justices of the Supreme Court, the court issued this order because the progress that had been achieved during the Supreme Court's oversight justified returning the FJD to local control.[2] J.A. at 412, 425, 427. The March 26 order eliminated the position of Executive Administrator and created an Administrative Governing Board for the FJD to be comprised of the three president judges and the three administrative judges of the district, along with the

_____

1. Brady was elected to Congress after this action was instituted. See Appellee Zappala's Br. at 2 n.1.

2. In April 1993, the Supreme Court vacated its December 19, 1990 order and issued an order lessening its involvement in the day-to-day operations of the FJD. This order was the first step in the process of returning the FJD to local control. J.A. at 165, 417. That process culminated in the March 26, 1996 order. J.A. at 412.

Administrator of the Pennsylvania Courts. The order directed the Administrative Governing Board to select a Court Administrator and Budget Administrator for the FJD, with the persons in these two positions being responsible for many of the duties the Executive Administrator had performed. The order named Gallas as Budget Administrator effective April 1, 1996, "[s]ince it is anticipated that it may take a short time . . . for the Administrative Governing Board to organize itself."3 J.A. at 308–12.

Meanwhile, there were problems in Gallas' marriage, and on September 22, 1995, his wife filed a Petition for Protection from Abuse ("PFA") alleging that he had physically abused her. J.A. at 92. Gallas claims that court personnel improperly released this PFA to the public on three separate occasions. According to Gallas' complaint, unknown court personnel released the contents of the PFA to the Democratic City Committee "within two hours" of its filing. J.A. at 93. Then, on September 26, 1995, the PFA was released to the Philadelphia Daily News by order of Esther Sylvester, the Administrative Judge of the Family Division of the Court of Common Pleas. J.A. at 93. According to the complaint, the newspaper secured this order through a request made by one of its reporters to Joseph DiPrimio, the Deputy Court Administrator of the Family Court Division.4 J.A. at 92–93. Finally, on or before March 23, 1996, unknown individuals again publicly released the PFA, along with the file from Gallas' divorce proceeding. J.A. at 98.

B. Procedural History

Gallas commenced this action on September 23, 1996, asserting claims for monetary relief against various defendants based on his termination and the releases of the documents from his domestic proceedings. In Counts I–III of

_____

3. Gallas later unsuccessfully applied for the position of Court Administrator. J.A. at 423. Gallas is no longer serving as Budget Administrator. See Appellant's Br. at 13.

4. Gallas alleges that the Philadelphia Daily News reported the contents of the PFA in a September 27, 1995 article entitled"Court Official a Wife Beater?" J.A. at 94.

7

his amended complaint, Gallas raised claims under section 1983 for invasion of privacy with respect to the three releases of the PFA and the release of the divorcefile. In these counts he named as defendants the Pennsylvania Supreme Court, the FJD, Judge Sylvester, DiPrimio, and the Democratic City Committee, along with Teamsters Local Union No. 115 (the "Teamsters") and 60 Doe defendants. J.A. at 96-99.5 The main allegation with respect to the Teamsters is that its secretary-treasurer obtained the PFA and made false statements about it in a publication entitled the Court Reporter on September 28, 1995. J.A. at 94, 103. It appears that the Teamsters became involved with the FJD and thus Gallas because of its attempt to represent certain court employees. In Count IV, also brought pursuant to section 1983, Gallas alleged that his termination as Executive Administrator violated his First and Fourteenth Amendment rights because it was undertaken in retaliation for his opposition to political patronage and was accomplished without notice and a hearing. This count named various defendants, including the Supreme Court and its justices, the FJD, Sobolevitch, Fumo, and 20 Doe defendants. J.A. at 99-101. In Count V, Gallas alleged a breach of employment contract against the Supreme Court and the FJD. J.A. at 101-02. In Count VI, Gallas alleged that Fumo, Brady, the Democratic City Committee, and 20 Doe defendants interfered with his contract for employment as Executive Administrator by inducing the Supreme Court to terminate him. J.A. at 102-03. Finally, in Count VII, Gallas alleged defamation against the Teamsters and its secretary-treasurer. J.A. at 103-04.

The district court dismissed or granted the defendants summary judgment on each of Gallas' claims in response to various motions by the defendants. See Gallas v. Supreme Court of Pa., No. CIV.A. 96-6450, 1998 WL 599249 (E.D. Pa. Aug. 24, 1998); Gallas v. Supreme Court of Pa., No. CIV.A. 96-6450, 1998 WL 352584 (E.D. Pa. June 15, 1998); Gallas v. Supreme Court of Pa., No. CIV.A. 96-6450, 1998 WL 22081 (E.D. Pa. Jan. 22, 1998); Gallas v. Supreme Court of Pa., No. CIV.A. 96-6450, 1997 WL 256972 (E.D.

_____

5. He did not name each of these defendants in all of the three counts.

8

Pa. May 15, 1997). We will summarize only those rulings of the district court which are at issue on this appeal.6

On May 16, 1997, the district court entered a memorandum and order which dismissed, on the basis of absolute judicial immunity, Gallas' claims against Judge Sylvester and DiPrimio arising from Judge Sylvester's order releasing the PFA. See Gallas, 1997 WL 256972, at *11–12. In the same memorandum and order, the district court dismissed Gallas' procedural due process claim to the extent that he based it on the alleged deprivation of a liberty interest; in this regard, the court found that Gallas failed to allege that he was stigmatized in connection with his termination as Executive Administrator. See id. at *19. On January 22, 1998, the district court entered an order and memorandum granting summary judgment against Gallas on the procedural due process claim to the extent that he based it on the alleged deprivation of a property interest; in this connection, the court concluded that there was insufficient evidence to establish that Gallas was anything other than an at-will employee. See Gallas, 1998 WL 22081, at *4–6. Then, on June 15, 1998, the district court entered an order and memorandum holding that Justices Zappala, Cappy, and Russell Nigro, along with Sobolevitch, were entitled to absolute legislative immunity with respect to Gallas' First Amendment claim arising from his termination as Executive Administrator. See Gallas, 1998 WL 352584, at *3–10. Gallas claims that these rulings were erroneous.

Gallas also has appealed certain discovery rulings by the district court. On September 9, 1998, the district court entered a memorandum and order quashing certain subpoenas which Gallas had issued for the purpose of conducting discovery as to the identities of the Doe defendants designated in the complaint. J.A. at 892. Then, on November 10, 1998, the district court entered an order

_____

6. The district court dismissed Gallas' claims against several of the defendants, including certain justices of the Supreme Court who were sued for monetary relief only in their official capacities on Eleventh Amendment grounds. See Gallas, 1997 WL 256972, at *5–8, *16–17. Gallas does not challenge these dismissals.

9

and memorandum granting summary judgment against Gallas on his interference with his employment claim; in so ruling, the court declined to extend the discovery deadline to permit Gallas to conduct further discovery relating to this claim. J.A. at 1146. Gallas argues that these rulings improperly limited his ability to collect evidence to support his case.7

## II. JURISDICTION

The district court had jurisdiction over Gallas' section 1983 claims pursuant to 28 U.S.C.   1331 and 1343 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C.   1367. We have jurisdiction over this appeal pursuant to 28 U.S.C.   1291.

## III. DISCUSSION

### A. Judicial Immunity

The first issue on appeal is whether Judge Sylvester and DiPrimio are entitled to absolute judicial immunity with regard to Judge Sylvester's order releasing the PFA to the Philadelphia Daily News. Following a motion to dismiss, the district court held that Judge Sylvester's order, as described in the amended complaint, constituted a judicial act for purposes of absolute immunity. See Gallas, 1997 WL 256972, at *11-12. Our review of the district court's order is plenary. See Children's Seashore House v. Waldman, 197 F.3d 654, 658 (3d Cir. 1999).

The Supreme Court long has recognized that judges are immune from suit under section 1983 for monetary damages arising from their judicial acts. See Mireles v. Waco, 502 U.S. 9, 9, 112 S.Ct. 286, 287 (1991); Forrester v. White, 484 U.S. 219, 225-27, 108 S.Ct. 538, 543-44

_____

7. According to Gallas' notice of appeal, "[t]he scope of this appeal includes all rulings of the [district] court pertaining to all named and unnamed defendants to this action as it was originally filed and later amended." J.A. at 1. Nevertheless, based on the issues presented and argued in Gallas' brief, we understand that he challenges only the rulings of the district court which we have described.

10

(1988); Stump v. Sparkman, 435 U.S. 349, 355-56, 98 S.Ct. 1099, 1104 (1978). The Court has described the reasons for recognizing this form of immunity as follows:

> [T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have . . . . [T]his is the principal characteristic that adjudication has in common with legislation and with criminal prosecution, which are the two other areas in which absolute immunity has most generously been provided. If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication.

Forrester, 484 U.S. at 226-27, 108 S.Ct. at 544 (citations omitted).

We must engage in a two-part inquiry to determine whether judicial immunity is applicable. "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." Mireles, 502 U.S. at 11, 112 S.Ct. at 288. "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. at 12, 112 S.Ct. at 288. With respect to the first inquiry, "the factors determining whether an act by a judge is a `judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Stump, 435 U.S. at 362, 98 S.Ct. at 1107. Our task is to "draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges," such as administrative acts. Forrester, 484 U.S. at 227, 108 S.Ct. at 544.

With respect to the second inquiry, we must distinguish between acts in the "clear absence of all jurisdiction," which do not enjoy the protection of absolute immunity, and acts

11

that are merely in "excess of jurisdiction," which do enjoy that protection:

> A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend.

Stump, 435 U.S. at 356 n.6, 98 S.Ct. at 1104 n.6 (citation omitted).

"A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the `clear absence of all jurisdiction.' " Id. at 356-57, 98 S.Ct. at 1105 (citation omitted); see also Forrester, 484 U.S. at 227, 108 S.Ct. at 544 (an act "does not become less judicial by virtue of an allegation of malice or corruption of motive"); Cleavinger v. Saxner, 474 U.S. 193, 200, 106 S.Ct. 496, 500 (1985) ("Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed.") (citation omitted). Immunity will not be forfeited because a judge has committed "grave procedural errors," Stump, 435 U.S. at 359, 98 S.Ct. at 1106, or because a judge has conducted a proceeding in an "informal and ex parte" manner. Forrester , 484 U.S. at 227, 108 S.Ct. at 544. Further, immunity will not be lost merely because the judge's action is "unfair" or controversial. See Cleavinger, 474 U.S. at 199-200, 106 S.Ct. at 500 (immunity applies "however injurious in its consequences [the judge's action] may have proved to the plaintiff ") (citation omitted); Stump, 435 U.S. at 363-64, 98 S.Ct. at

12

1108 ("Disagreement with the action taken by the judge . . . does not justify depriving that judge of his immunity. . . . The fact that the issue before the judge is a controversial one is all the more reason that he should be able to act without fear of suit."). In sum, our analysis must focus on the general nature of the challenged action, without inquiry into such "specifics" as the judge's motive or the correctness of his or her decision. See Mireles , 502 U.S. at 13, 112 S.Ct. at 288 ("[T]he relevant inquiry is the `nature' and `function' of the act, not the `act itself.' In other words, we look to the particular act's relation to a general function normally performed by a judge . . . .") (citation omitted).

According to Gallas' complaint, Judge Sylvester ordered the release of the PFA "for no judicial purpose and for the sole purpose of injuring the reputation of [Gallas] . . . without notice to [Gallas], and without a hearing designed to consider just cause for the release of it." J.A. at 93-94. The complaint further alleges that Judge Sylvester"was motivated by a non-judicial intent to undermine[Gallas'] moral authority as Executive Administrator, and to assist political opponents of [Gallas] in terminating his employment." J.A. at 97. Gallas argues that Judge Sylvester's order releasing the PFA was an administrative act rather than a judicial one, "since clerks and not judges are typically the custodians of the public record." See Appellant's Br. at 27. Gallas further contends that Judge Sylvester acted in the absence of all jurisdiction; in this regard, he alleges that "[a]ll [PFAs] are impounded under the rules of the court, maintained in confidence, and were to be released only as evidence in a judicial proceeding, and then only upon judicial order following a verified petition properly noticed upon all interested parties." J.A. at 92. In addition, Gallas argues, though without citation to any authority, that only the judge actually assigned to his domestic proceedings had the power to order a release of the PFA. See Appellant's Br. at 31.

Gallas' arguments notwithstanding, we hold that Judge Sylvester is entitled to the protection of judicial immunity. Her order, as described in the amended complaint, undeniably was a judicial act. Contrary to Gallas' argument that "clerks and not judges are typically the custodians of

13

the public record," Appellant's Br. at 27, the issuance of an order releasing a court record to the public is certainly a "function normally performed by a judge," and the newspaper reporter "dealt with the judge in [her] judicial capacity" when he approached Judge Sylvester (through DiPrimio) seeking an order releasing the PFA. See Stump, 435 U.S. at 362, 98 S.Ct. at 1107. Indeed, Gallas' complaint states that Judge Sylvester's actions were taken "under the color of state law and as agent of the. . . [Court of Common Pleas]" and that Judge Sylvester "used the color of her authority under state law" to order the release of the PFA. See J.A. at 83, 97. These allegations recognize that Judge Sylvester was acting in her judicial capacity. See id. at 360, 98 S.Ct. at 1106 ("[W]e cannot characterize the approval of the petition as a nonjudicial act. [Plaintiffs] themselves stated in their pleadings before the District Court that Judge Stump was `clothed with the authority of the state' at the time that he approved the petition and that `he was acting as a county circuit court judge.' ").

The fact that Judge Sylvester issued the order ex parte, without notice to Gallas or an opportunity for him to be heard, does not mean that her act was not judicial. In Stump, the Supreme Court held that a judge was absolutely immune with respect to his approval of a mother's ex parte petition for an order permitting the sterilization of her mentally challenged daughter. Id. at 355-64, 98 S.Ct. at 1104-09. The Court squarely rejected the plaintiffs' argument that the approval of the petition was not a judicial act because it was "not given a docket number, was not placed on file with the clerk's office, and was approved in an ex parte proceeding without notice to the minor, without a hearing, and without the appointment of a guardian ad litem." Id. at 360-63, 98 S.Ct. at 1106-08. In the Court's view, "[b]ecause Judge Stump performed the type of act normally performed only by judges and because he did so in his capacity as a Circuit Court Judge, we find no merit to [plaintiffs'] argument that the informality with which he proceeded rendered his action nonjudicial and deprived him of his absolute immunity." Id.  at 362-63, 98 S.Ct. at 1108.8

_____

8. Gallas' brief states that "[h]ad Gallas been notified of the pending request for the release of [the PFA], and been given an opportunity to

14

Further, the allegations of the complaint do not indicate that Judge Sylvester acted in the clear absence of all jurisdiction. We will accept Gallas' allegation that Judge Sylvester violated a court "rule" which allowed the release of an impounded PFA only for purposes of its use as evidence in a judicial proceeding, and only then upon judicial order following a verified petition properly noticed to all interested parties.9 Yet, such a procedural error at most might establish that Judge Sylvester acted in excess of her jurisdiction, not that she acted in the clear absence of all jurisdiction. See id. at 359, 98 S.Ct. at 1106 ("A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors."); see also Mireles , 502 U.S. at 13, 112 S.Ct. at 289 (holding that a judge merely acted in

_____

respond to that request, then [Judge Sylvester's] decision may have risen to the level of a judicial decision, and thus been subject to immunity." Appellant's Br. at 27. Yet, the Supreme Court has made clear that an act does not lose its judicial character merely because it is done ex parte or is imbued with procedural error. Accordingly, if, as Gallas apparently concedes, Judge Sylvester's order would have been a judicial act had Gallas received notice and an opportunity to respond, then her order nevertheless was a judicial act even in the absence of such procedural protections.

9. The court "rule" to which Gallas' complaint apparently refers was published as a "Court Notice[ ]" in The Legal Intelligencer. It reads as follows:

> Please take note that Family Court records, including . . . Protection from Abuse records . . . are impounded and are not subject to inspection except by a party to the action or counsel of record for the party whose records are to be inspected unless otherwise provided by statute or rule. These records may not be removed for copying or any other purpose except by special order of the court.
>
> If any of these records are required as evidence in a civil, criminal, administrative or disciplinary proceeding, a verified petition setting forth the reasons why the record is needed must befiled with the Administrative Judge of the Family Court Division or his judicial designee. An appropriate order must accompany the petition.

J.A. at 129 (emphasis added).

15

excess of his authority in ordering police officers to use excessive force in bringing an attorney to his courtroom for a calendar call); Rolleston v. Eldridge, 848 F.2d 163, 164–65 (11th Cir. 1988) ("Even assuming that Judge Eldridge had not followed procedural rules, his action would still be within his jurisdiction.").

We recognize that Gallas contends that only the judge who actually presided over his domestic proceedings had the power to order a release of the PFA. But Gallas has not pointed to any rule or other authority indicating that Judge Sylvester did not have the authority to issue a release order.10 Moreover, even if he did point to a rule that indicated that another judge should have entertained the application for release of the PFA, we would not hold that Judge Sylvester acted in the clear absence of all jurisdiction in issuing the order.

In fact, we recently dealt with and rejected a similar claim in Figueroa v. Blackburn, No. 99-5252, ___ F.3d ___, 2000 WL 340794 (3d Cir. Mar. 27, 2000). In Figueroa we held that a New Jersey municipal court judge had absolute judicial immunity for her act in holding a party in contempt and jailing him without granting a stay as required by court rule even though in hearing the case she acted contrary to a Supreme Court of New Jersey directive that required her to transfer the case to another judge. Thus, we hold that a judge does not act in the clear absence of all jurisdiction when the judge enters an order at least colorably within the jurisdiction of her court even though a court rule or other procedural constraint required another judge to act in the matter. We also note, though our result is not dependent on the point, that Judge Sylvester was the administrative judge of the Family Court Division and thus it might be

_____

10. The record indicates that a judge of the Family Court Division ordered the records of Gallas' divorce and abuse proceedings sealed on October 26, 1995––well after Judge Sylvester ordered the release of the PFA. J.A. at 105–06. In any event, even if the record had been sealed prior to Judge Sylvester's order, this would not mean that she acted in the complete absence of all jurisdiction in releasing the PFA. Indeed, the October 26, 1995 sealing order stated that requests to view the sealed records could be approved by the motion court judge or the administrative judge. J.A. at 106.

16

expected that she would entertain the application for the release of the PFA in the sensitive situation in which the FJD's Executive Administrator was a party.11

Finally, Gallas' allegations that Judge Sylvester ordered the release of the PFA "for no judicial purpose and for the sole purpose of injuring the reputation of [Gallas]," J.A. at 93-94, and that Judge Sylvester "was motivated by a non-judicial intent to undermine [Gallas'] moral authority as Executive Administrator, and to assist political opponents of [Gallas] in terminating his employment," J.A. at 97, are irrelevant, as judicial immunity is not forfeited by allegations of "malice or corruption of motive." Forrester, 484 U.S. at 227, 108 S.Ct. at 544; see also Stump, 435 U.S. at 363-64, 98 S.Ct. at 1108 (allegations that judge's action was "unfair" and "totally devoid of judicial concern for the interests and well-being of the young girl involved" could not overcome judicial immunity).12

_____

11. Again though our result is not dependent on it, we note that the court "rule" regarding release of PFAs indicates that at least in some circumstances an interested party seeking their release should apply to the administrative judge or his judicial designee. See J.A. at 129. Judge Sylvester was the administrative judge.

12. Gallas relies on Barrett v. Harrington , 130 F.3d 246 (6th Cir. 1997). In that case, the court held that a judge was entitled to absolute judicial
immunity with respect to her conduct in notifying prosecutors that she was being harassed by a disgruntled litigant. See id. at 257-60. The court held that judicial immunity was not applicable, however, with respect to the judge's statements to members of the news media about the litigant. See id. at 260-61. In the court's view, "speaking to the media
and giving interviews about a litigant on a case over which the judge has presided is not normally a judicial function nor is it usually in furtherance of a judicial function," because"[u]nlike filing a complaint with law enforcement . . . , speaking to the media .. . in no way protects the integrity of the judicial institution or the decision-making process." Id. at 261. Gallas seeks to draw an analogy between Judge Sylvester's order releasing the PFA to the media and the comments to the media made by the judge in Barrett. This analogy must fail. While a judge may "step[ ] out of her judicial role" when she chooses to talk to the media about a litigant appearing before her, see id. , a judge certainly does not
step out of her judicial role when she entertains a petition for an order releasing a court record.

17

We recognize that the complaint contains little information regarding the precise circumstances leading to Judge Sylvester issuing the order. We do not know, for example, whether the order was oral or written, whether legal argument was presented to Judge Sylvester prior to the issuance of the order, or whether legal counsel for the newspaper participated to any extent. We will assume that Judge Sylvester issued the order orally, with no presentation of a written petition or legal argument by the newspaper and no involvement by the newspaper's counsel. Nevertheless, even under these circumstances, Judge Sylvester's order was a judicial act not undertaken in the complete absence of jurisdiction.[13]

Our conclusion that Judge Sylvester is entitled to absolute judicial immunity in turn demands that DiPrimio be accorded absolute "quasi-judicial" immunity. As mentioned, according to the complaint, the Philadelphia Daily News obtained the release order from Judge Sylvester by means of its reporter's request to DiPrimio. J.A. at 92–93. In the circumstances, we have no trouble concluding that he should be absolutely immune for simply acting as an intermediary between the newspaper and the judge. See Forrester, 484 U.S. at 225, 108 S.Ct. at 543 (indicating that the protections of judicial immunity extend to officials "who perform quasi-judicial functions"); Moore v. Brewster, 96 F.3d 1240, 1244 (9th Cir. 1996) ("[Defendant], while acting as Clerk of the United States District Court . . . in many of his actions performed quasi-judicial functions. . . . Even if . . . [defendant] deceived [plaintiff] regarding the status of the [supersedeas] bond and improperly conducted hearings to assess costs, all in coordination with Judge Brewster, such acts would fall within [defendant's] quasi-judicial duties and are thus protected by absolute immunity."); McArdle v. Tronetti, 961 F.2d 1083, 1085 (3d Cir. 1992) (holding that a prison physician who prepared an

_____

13. We note that the cases seem to refer interchangeably to a judge acting in the "complete" or "clear" absence of all jurisdiction. But plainly a judge does not lose immunity merely because it is later determined that in fact he or she did not have jurisdiction and in that sense the absence of jurisdiction was "complete." See Stump v. Sparkman, 435 U.S. at 356–57, 98 S.Ct. at 1104–05.

18

evaluation of an inmate pursuant to a judge's request was "functioning as an arm of the court" and "[a]s such, he was an integral part of the judicial process and is protected by the same absolute judicial immunity that protects Judge Connelly"); Dellenbach v. Letsinger, 889 F.2d 755, 763 (7th Cir. 1989) ("[W]e conclude on the facts before us that the court personnel are entitled to absolute quasi-judicial immunity for their alleged acts . . . pursuant to the judge's instructions.").

In sum, the district court did not err in dismissing Gallas' claims against Judge Sylvester and DiPrimio with respect to Judge Sylvester's order releasing the PFA.

B. Legislative Immunity

The next issue we address is whether Justices Zappala, Cappy, and Nigro, as well as Sobolevitch, are entitled to absolute legislative immunity with regard to Gallas' claims arising from his termination as Executive Administrator. The district court granted summary judgment with respect to Gallas' First Amendment claim on the ground that the Pennsylvania Supreme Court's March 26 order reorganizing the FJD constituted a legislative act to which absolute immunity should attach. See Gallas, 1998 WL 352584, at *3-10. Our standard of review is plenary. See Doby v. DeCrescenzo, 171 F.3d 858, 867 (3d Cir. 1999).

Legislators enjoy absolute immunity from liability for their legislative acts. See Bogan v. Scott-Harris, 523 U.S. 44, 46, 118 S.Ct. 966, 969 (1998); Supreme Court of Va. v. Consumers Union of the United States, Inc., 446 U.S. 719, 732, 100 S.Ct. 1967, 1974 (1980); Larsen v. Senate of Pa., 152 F.3d 240, 249 (3d Cir. 1998), cert. denied , 525 U.S. 1145, 119 S.Ct. 1041 (1999). In determining whether an official is entitled to legislative immunity, we must focus on the nature of the official's action rather than the official's motives or the title of his or her office. See Bogan, 523 U.S. at 54, 118 S.Ct. at 973 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); Forrester, 484 U.S. at 224, 108 S.Ct. at 542 ("Running through our cases. . . is a `functional' approach to immunity questions . .. . Under that approach, we examine the nature of the functions with

19

which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."); Larsen, 152 F.3d at 253 ("Legislative immunity must be applied pragmatically, and not by labels.").

In accordance with this functional approach, the Supreme Court has recognized that judges sometimes perform legislative actions. See Forrester, 484 U.S. at 227, 108 S.Ct. at 544 (noting a distinction "between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform") (emphasis added). Thus, in Consumers Union the Supreme Court afforded legislative immunity to the Virginia Supreme Court and its chief justice in connection with the promulgation of the state bar code. See Consumers Union, 446 U.S. at 731–34, 100 S.Ct. at 1974–76 ("[T]he Virginia Court is exercising the State's entire legislative power with respect to regulating the Bar, and its members are the State's legislators for the purpose of issuing the Bar Code."). Similarly, we have indicated that non-legislators performing legislative functions may claim legislative immunity. See Aitchison v. Raffiani, 708 F.2d 96, 99–100 (3d Cir. 1983) (holding that a mayor and a borough attorney were entitled to legislative immunity with respect to their involvement in the passage of an ordinance eliminating the plaintiff 's job position; stating that "we look to the function the individual performs rather than his location within a particular branch of government"); see also Bogan, 523 U.S. at 55, 118 S.Ct. at 973 ("We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions . . . .") (citing Consumers Union).

Accordingly, the question here is whether the justices of the Pennsylvania Supreme Court performed a legislative function when they issued the March 26 order reorganizing the FJD. We have employed a two-part test to determine whether an act is legislative:

> First, the act must be `substantively' legislative, i.e., legislative in character. Legislative acts are those which involve policy-making decision [sic] of a general scope

20

or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a single individual, the legislative power is not

implicated, and the act takes on the nature of administration.14 In addition, the act must be `procedurally' legislative, that is, passed by means of established legislative procedures. This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve.

Ryan v. Burlington County, 889 F.2d 1286, 1290-91 (3d Cir. 1989).

It is clear that the issuance of the March 26 order was a "substantively" legislative act. The Pennsylvania Supreme Court issued this order (as well as its prior orders relating to the reformation of the FJD) pursuant to a direct grant of rulemaking authority from the state constitution. Under the Pennsylvania Constitution, the Supreme Court "shall exercise general supervisory and administrative authority over all the courts," Pa. Const. art. V, 10(a), and it "shall appoint a court administrator and may appoint such subordinate administrators and staff as may be necessary and proper for the prompt and proper disposition of the business of all courts." Pa. Const. art. V, 10(b). Most significantly, the Supreme Court "shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts . . . including . . . the administration of all courts and supervision of all officers of the judicial branch." Pa. Const. art. V, 10(c). See Callahan v. City of Philadelphia, No. 99-1816, ___ F.3d ___, 2000 WL 311128, at *4-6 (3d Cir. Mar. 28, 2000). In essence, then, the Supreme Court performed the same type of function in issuing the March 26 order as the Pennsylvania General Assembly performs when it exercises its constitutionally granted power to pass legislative enactments. See Pa.

_____

14. Of course, in Ryan we did not mean to imply that a legislative body, passing a de jure law affecting only a single person, would not be entitled to legislative immunity.

21

Const. art. II,  1 ("The legislative power of this Commonwealth shall be vested in a General Assembly. . . ."). [15]

Further, the March 26 order involved a "policy-making decision of a general scope," rather than a decision "affect[ing] a small number or a single individual." See Ryan, 889 F.2d at 1291. Beyond eliminating Gallas' position, the order provided for a broad reorganization of the supervisory structure of the FJD. The order created an Administrative Governing Board to be comprised of local judges along with the Administrator of the Pennsylvania Courts. The Board was given specific duties and powers, including the selection of a Court Administrator and Budget Administrator and a responsibility to "monitor the overall performance of all courts and departments of the District in an attempt to achieve the very best court system possible." J.A. at 309-10. The order further identified the duties of the Court Administrator and the Budget Administrator and provided for the assignment of their staffs. J.A. at 310-11. In sum, the March 26 order represented a general overhaul of the FJD's administrative structure pursuant to the Supreme Court's constitutionally granted power to promulgate rules governing the operation of Pennsylvania courts. We must conclude, then, that the issuance of the order was a "substantively" legislative act. See Consumers Union, 446 U.S. at 731-34, 100 S.Ct. at 1974-76 (granting legislative immunity to state supreme court and its chief justice with respect to the exercise of the court's inherent power to issue the state's bar code). [16]

_____

15. Gallas argues that the quoted provisions of the Pennsylvania Constitution grant the Supreme Court the power to act "administratively" rather than "legislatively." See Appellant's Br. at 36, 41; see also Callahan, 2000 WL 311128, at *6. It is true that Article V, Section 10 employs the term "administration." Yet, as we have indicated, "[l]egislative immunity must be applied pragmatically, and not by labels." Larsen, 152 F.3d at 253. It is clear that the Pennsylvania Constitution's broad grant of authority empowers the Supreme Court to make not only "administrative" decisions but also discretionary, policymaking decisions of a "legislative" nature with respect to the Pennsylvania courts.

16. Gallas argues that the March 26 order was "administrative activity . . . not unlike one finds at the top of any number of large bureaucratically organized institutions, who manage through the

22

The Supreme Court recently recognized that the
elimination of a public employment position -- as opposed
to the firing of a single individual -- constitutes a
"legislative" act. In Bogan, the plaintiff filed a section 1983
action against various local officials, including the mayor
and a member of the city council, alleging that an
ordinance eliminating her position was motivated by racial
animus and retaliation for her exercise of First Amendment

_____

clarification of policies and through the organization and reorganization
of agencies." Appellant's Br. at 40. Perhaps Gallas is suggesting that
extending legislative immunity to the justices of the Pennsylvania
Supreme Court in this case will open the door to applying such
immunity to other persons who undertake to reorganize the structure of
public agencies or departments. We, however, in adjudicating this matter
express no opinion on the precise reach of legislative immunity in other
contexts. What we do say is that such immunity applies where the
highest court of a state exercises its direct constitutional authority to
promulgate rules and orders governing the "practice, procedure and . . .
conduct" of state courts. See Pa. Const. art. V,   10(c). There can be no
doubt that legislative immunity would apply if the Pennsylvania General
Assembly were to pass a statute providing for the same form of
reorganization which was created by the Supreme Court's March 26
order. See Consumers Union, 446 U.S. at 733-34, 100 S.Ct. at 1975
("[T]here is little doubt that if the Virginia Legislature had enacted the
State Bar Code and if suit had been brought against the legislature, its
committees, or members . . . the defendants in that suit could
successfully have sought dismissal on the grounds of absolute legislative
immunity.").

In Consumers Union, it was argued that legislative immunity should
not extend to the Virginia Supreme Court in connection with its
promulgation of the state bar code because "many executive and agency
officials wield authority to make rules in a wide variety of
circumstances." See id. at 734, 100 S.Ct. at 1975. The Supreme Court
rejected this argument, stating that "in this case the Virginia [Supreme]
Court claims inherent power to regulate the Bar, and. . . [it] is
exercising the State's entire legislative power with respect to regulating
the Bar, and its members are the State's legislators for the purpose of
issuing the Bar Code." Id. at 734, 100 S.Ct. at 1975-76. Like the Virginia
Supreme Court, the Pennsylvania Supreme Court here exercised
"inherent power" to regulate the lower courts and "its members are the
State's legislators for the purpose of " regulating those courts.
Accordingly, legislative immunity is appropriate.

23

rights. See Bogan, 523 U.S. at 47, 118 S.Ct. at 969. The Supreme Court held that the defendants' actions were both substantively and procedurally legislative:

> This leaves us with the question whether, stripped of all considerations of intent and motive, [defendants'] actions were legislative. We have little trouble concluding that they were. Most evidently, [the city council member's] acts of voting for an ordinance were, in form, quintessentially legislative. [The mayor's] introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official . . . .

> [Plaintiff], however, asks us to look beyond [defendants'] formal actions to consider whether the ordinance was legislative in substance. We need not determine whether the formally legislative character of [defendants'] actions is alone sufficient to entitle [defendants] to legislative immunity, because here the ordinance, in substance, bore all the hallmarks of traditional legislation. The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office. And the city council, in eliminating [plaintiff 's position], certainly governed in a field where legislators traditionally have power to act. Thus, [defendants'] activities were undoubtedly legislative.

Id. at 55–56, 118 S.Ct. at 973 (citation and internal quotation marks omitted).17 In light of Bogan, the Pennsylvania Supreme Court's "discretionary, policymaking

_____

17. By comparison, in Forrester, 484 U.S. at 229–30, 108 S.Ct. at 545–46, the Court held that the demotion and discharge of a single employee was an administrative act, and hence not within the scope of judicial immunity.

decision" to eliminate the position of Executive Administrator should be classified as a legislative act.18

Turning to the second prong of the Ryan test, the undisputed evidence indicates that the March 26 order was "procedurally" legislative. The record includes an affidavit from Justice Cappy describing the process by which the Pennsylvania Supreme Court exercises its constitutional authority to oversee the lower courts:

> The Supreme Court exercises this constitutional authority by following certain established procedures: proposals are circulated among the Justices; the Justices engage in deliberation regarding the proposals; after deliberation, the Justices vote; and, in the event a proposal is adopted, the Court issues an appropriate order.
>
> . . . .
>
> [With respect to the March 26 order,] the Justices of the Court deliberated on the merits of various alternatives to the Court's continued oversight of the FJD. Following these deliberations, the Justices voted to reorganize the administration of the FJD and implement the Court's policy decision to return control to the FJD judges and officials. Pursuant to its deliberations and vote, on March 26, 1996, the Supreme Court issued an order reorganizing the FJD
> . . . .

J.A. at 412, 418. Thus, as the evidence demonstrates, the Supreme Court determined in its discretion that the time had come to return the FJD to local control; the Justices then debated alternatives, voted, and issued a directive

_____

18. Affidavits from Justices Cappy, Zappala, and Nigro indicate that the March 26 order resulted from an exercise of the Supreme Court's discretionary judgment that sufficient progress had been made in the reformation of the FJD as to justify a return to local control. J.A. at 412, 425, 427. Of course, the justices are entitled to legislative immunity regardless of their motive in making the March 26 order.

25

reorganizing the FJD. This procedure was no different from that which a legislature would follow in like circumstances.19

In sum, the issuance of the March 26 order was both substantively and procedurally legislative, and accordingly the district court did not err in applying legislative immunity to Justices Zappala, Cappy, and Nigro with respect to claims arising from Gallas' termination as Executive Administrator. Having reached this conclusion, we must afford quasi-legislative immunity to Sobolevitch, whose role in the reorganization derived from the Supreme Court's order.20 See Aitchison, 708 F.2d at 99-100 (holding that borough attorney who "was acting in direct assistance of legislative activity" was entitled to absolute immunity). Indeed, Gallas' counsel conceded before the district court that Sobolevitch should receive immunity if the members of the Supreme Court are declared immune. J.A. at 667-68. See Gallas, 1998 WL 352584, at *9.

## C. Discovery Issues

Gallas raises two challenges to the district court's management of discovery. First, Gallas challenges the district court's September 9, 1998 order quashing certain deposition subpoenas which he issued on or about March 27, 1998. Gallas sought these depositions in part for the purpose of obtaining the identities of the Doe defendants designated in his complaint. The district court precluded Gallas from conducting depositions for this purpose

_____

19. We are not suggesting that our result would have been different if the Supreme Court had adopted the March 26 order with fewer procedural steps.

20. Although the district court addressed legislative immunity only with respect to the First Amendment claim in Count IV, such immunity also bars Gallas' procedural due process claim as against these four defendants. Thus, we need not determine whether the district court erred in dismissing the due process claim for failure to show the deprivation of a liberty or property interest.

Aside from Zappala, Cappy, Nigro, and Sobolevitch, Gallas asserted the First Amendment and due process claims in Count IV against several other defendants. The district court dismissed these claims against these other defendants on grounds which Gallas does not challenge here. See Gallas, 1997 WL 256972, at *6-22.

because it concluded that, even if Gallas identified the Doe defendants, it simply was too late for their service in accordance with Fed. R. Civ. P. 4(m) and it likewise was too late for Gallas to amend his complaint to assert timely claims against them. In this connection, the district court held that any amendment of the complaint to name the Doe defendants would not relate back to the date of the original complaint under Fed. R. Civ. P. 15(c)(3). J.A. at 897.

On this appeal, Gallas argues that he should have been permitted to conduct depositions for the purpose of identifying the Doe defendants who released his PFA and divorce file. He argues that the district court erred with respect to Rule 4(m), but he presents no argument regarding timeliness or relation-back. Gallas' section 1983 claims relating to the releases of the PFA and divorce file are subject to Pennsylvania's two-year limitations period for personal injury claims. See Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998). The alleged releases took place in September 1995 and again on or before March 23, 1996. Accordingly, in the absence of relation-back, any amendment of the complaint after March 23, 1998, to name the Doe defendants with respect to the last of the releases would be time-barred. Yet, Gallas makes no attempt to point out anything in the record indicating that the strict requirements for relation-back under Rule 15(c)(3) have been met. See Nelson v. County of Allegheny, 60 F.3d 1010, 1014 n.6 (3d Cir. 1995) (replacing a John Doe with a party's real name amounts to "changing a party" under Rule 15(c)(3)). Accordingly, we will not disturb the district court's decision to quash the subpoenas.

Second, Gallas contends that the district court erred in refusing to grant him additional time to conduct discovery with respect to his interference with employment claim. On November 10, 1998, more than two years after Gallas commenced this action and more than six months after the discovery deadline passed, the district court entered an order granting summary judgment in favor of Fumo, Brady, and the Democratic City Committee on the ground that Gallas had failed to come forward with any evidence that these defendants attempted to influence the members of

27

21. We do not imply that Fumo, Brady, and the Democratic City Committee could be liable for attempting to influence the Pennsylvania Supreme Court with respect to the administrative structure in the FJD. After all, imposition of liability for such conduct would have First Amendment implications of its own. Moreover, it is not immediately evident why persons interested in public affairs should be liable for trying to influence a body exercising legislative functions to act in a particular way. In view of our disposition of the case we, however, have no need to consider this substantive point.

the Pennsylvania Supreme Court to terminate him. 21 In so ruling, the district court declined to extend the discovery deadline any further. J.A. at 1146.

Our standard of review with regard to the district court's management of discovery is abuse of discretion. See Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n, 107 F.3d 1026, 1032 (3d Cir. 1997). "[W]e will not upset a district court's conduct of discovery procedures absent a demonstration that the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible." In re Fine Paper Antitrust Litig., 685 F.2d 810, 818 (3d Cir. 1982) (internal quotation marks omitted) (emphasis in original). The record indicates that Gallas had sufficient time to conduct discovery during the 25 months between the filing of his complaint and the entry of summary judgment on the interference with employment claim, despite the fact that relatively brief stays of discovery occupied some of that time. Accordingly, we find no abuse of discretion. See Massachusetts Sch. of Law, 107 F.3d at 1034 ("[T]he district court, by allowing fairly extensive discovery and then closing discovery and entertaining the summary judgment motion, did not abuse its discretion.").

IV. CONCLUSION

For the foregoing reasons, the orders of the district court challenged by Gallas on this appeal will be affirmed.

28

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

29