OPINION OF THE COURT
SCIRICA, Chief Judge.
This appeal arises from an action brought by Amiri Baraka under 42 U.S.C. §§ 1988 and 1988 and 28 U.S.C. § 2201 against officials, employees, and entities of the State of New Jersey. Baraka alleges defendants violated his constitutional rights by eliminating his position as poet laureate of New Jersey. The District Court dismissed Baraka’s complaint under Fed.R.Civ.P. 12(b)(6) for failure to .state a claim upon which relief can be granted. We will affirm.
I.
Amiri Baraka, a poet, was appointed poet laureate of New Jersey in July 2002, by Governor James McGreevey, on the recommendation of the New Jersey State Council for the Arts. The New Jersey State Legislature created the position of poet laureate in 1999 when it enacted P.L. 1999, c. 228 (codified at N.J. Stat. Ann. § 52:16A-26.9 (repealed 2003)).[1] The stat *194 ute provided the governor would biennially appoint a State poet laureate who would serve for two years and receive an honorarium of $10,000. The poet laureate would promote poetry within the State and give at least two public readings each year. Id.
Two months after his appointment, Bar-aka read his poem entitled “Somebody Blew Up America” at the Geraldine R. Dodge Poetry Festival in Stanhope, New Jersey. The poem commented generally on American society and politics, and on terrorism, specifically referencing the terror attacks of September 11, 2001, and read, in part: “Who knew the World Trade Center was gonna get bombed/Who told 4000 Israeli workers at the Twin Towers to stay home that day/Why did Sharon stay away?”[2]
After an outcry, a spokesman for Governor McGreevey issued a statement that “[t]he governor strictly criticizes any racist or anti-Semite behavior. The style of Bar-aka’s recent verse implies that Israelis had known about the September 11 terrorism attacks.” (Second Am. Compl. ¶ 15.) Governor McGreevey asked Baraka to resign. Baraka refused, contending the poem was neither anti-Semitic nor racist.
Baraka alleges Governor McGreevey then instructed Sharon Harrington, the chair of the New Jersey State Council for the Arts, to withhold payment of the $10,000 honorarium. Baraka also alleges Governor McGreevey and other defendants “commenced a concerted campaign” to remove him from his position or to abolish the position of poet laureate altogether. Soon thereafter, the New Jersey State Legislature passed P.L.2003, c. 123, which repealed section 52:16A-26.9 and abolished the position of poet laureate.[3] Governor McGreevey signed the repealer into law on July 2, 2003.
Baraka filed a complaint under 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 2201 against Governor McGreevey, in his individual and official capacities, Harrington, in her individual and official capacities, the New Jersey State Council for the Arts, the State of New Jersey, and various unknown employees, agents, legislative officials, and entities of the State of New Jersey, in their individual and official capacities. Baraka alleged that by abolishing the position of poet laureate and denying him the honorarium to punish him for expressing his views, defendants violated his right to free speech under the First Amendment and his right to due process of law under the Fourteenth Amendment. Baraka also alleged various causes of action under the New Jersey Constitution and New Jersey state law. He requested payment of the $10,000-per-year honorarium for two years,[4] immediate reinstatement to the position of poet laureate, compensatory and punitive damages, and attorneys’ fees.
The District Court granted defendants’ motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The court dismissed Baraka’s claims against the State, the Arts Council, and the unknown *195 government employees and entities on the basis of Eleventh Amendment immunity. It dismissed the claims against Governor McGreevey and Harrington on the basis of absolute legislative immunity. The court dismissed Baraka’s claim for the honorarium after concluding, under New Jersey law, he had no legally enforceable right to payment. It dismissed the claims against unknown government individuals and entities because Baraka failed to allege specific conduct on their part that led to his harm. In the absence of any viable federal claim, the court declined to exercise pendent jurisdiction over Baraka’s state law claims.
On appeal, Baraka contends the District Court erred by: (1) holding Governor McGreevey and Harrington were protected by absolute legislative immunity; (2) holding Baraka was not deprived of a constitutionally protected property interest without due process of law; (3) declining to address Baraka’s claim he was deprived of a constitutionally protected liberty interest; (4) dismissing the case as to various unknown government individuals, entities, and agencies; and (5) failing to exercise pendent jurisdiction over the state law claims.[5]
II.
The District Court had subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Our review of a district court’s dismissal of a complaint under Rule 12(b)(6) is plenary. Vallies v. Sky Bank, 432 F.3d 493, 494 (3d Cir.2006). A Rule 12(b)(6) motion will be granted “ ‘if it appears to a certainty that no relief could be granted under any set of facts which could be proved.’ ” Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir.2005) (quoting D.P. Enter. Inc. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir.1984)). We must accept all factual allegations in Baraka’s complaint as true, but we are not compelled to accept “unsupported conclusions and unwarranted inferences,” Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir.1997), or “a legal conclusion couched as a factual allegation,” Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). We review a district court’s dismissal of pendent state law claims for abuse of discretion. Markowitz v. Ne. Land Co., 906 F.2d 100, 103 (3d Cir.1990); Cooley v. Pa. Hous. Fin. Agency, 830 F.2d 469, 471 (3d Cir.1987).
III.
A.
Baraka contends his claims against Governor McGreevey and Harrington are not barred by legislative immunity because neither is a legislator and their actions were not legislative in nature. He contends their actions were political — advocating legislation — and administrative-targeting a single person for punitive treatment. We believe Governor McGree-vey’s and Harrington’s actions are properly characterized as legislative and are entitled to immunity.
“Absolute legislative immunity attaches to all actions taken ‘in the sphere of legitimate legislative activity.’ ” Bogan v. Scott-Harris, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). Legislative immunity shields from suit not only *196 legislators, but also public officials outside of the legislative branch when they perform legislative functions. See id. (affording absolute legislative immunity to a may- or); Sup.Ct. of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 734, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980) (same, to the Virginia Supreme Court and its members); Gallas v. Sup.Ct. of Pa., 211 F.3d 760, 776-77 (3d Cir.2000) (same, to the Pennsylvania Supreme Court and its members); Aitchison v. Raffiani, 708 F.2d 96, 99 (3d Cir.1983) (same, to members of a city council, a mayor, and a city attorney). The relevant question is whether Governor McGreevey and Chair Harrington’s actions were “ ‘in the sphere of legitimate legislative activity.’ ” Bogan, 523 U.S. at 54, 118 S.Ct. 966 (quoting Tenney, 341 U.S. at 376, 71 S.Ct. 783).
1.
In Youngblood v. DeWeese, 352 F.3d 836 (3d Cir.2004), we addressed the distinction between legislative and political activities on the part of state legislators. As examples of legislative activities, we cited “voting for a resolution, subpoenaing and seizing property and records for a committee hearing, preparing investigative reports, addressing a congressional committee, and, of course, speaking before the legislative body in session.” Id. at 840 (internal citations omitted). We contrasted these with examples of political activities, including “ ‘a wide range of legitimate “errands” performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called “news letters” to constituents, news releases, and speeches delivered outside the Congress.’ ” Id. (quoting United States v. Brewster, 408 U.S. 501, 512, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972)). In Youngblood, therefore, we used the term “political” to refer to patronage practices and activities by officials, not directly related to enacting legislation. Baraka also appears to use the term to express this narrow meaning.
But as these examples illustrate, activities by legislators that directly affect drafting, introducing, debating, passing or rejecting legislation, are “ ‘an integral part of the deliberative and communicative processes,’ ” and are properly characterized as legislative, not political patronage. Id. (quoting Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)). Activities that are “ ‘casually or incidentally related to legislative affairs but not a part of the legislative process itself,’” are not. Id. (quoting Brewster, 408 U.S. at 528, 92 S.Ct. 2531).
Baraka describes the actions of Governor McGreevey and Harrington as “advocating and promoting legislation.” He contends legislative immunity does not apply because they are not legislators and because these are political, not legislative, activities. But when a governor and a governor’s appointee advocate bills to the legislature, they act in a legislative capacity-
Baraka appears to concede as much. He alleges Governor McGreevey and Harrington actively participated in the legislative process. The repealer was allegedly passed at the “urging, direction and request” (Second Am. Compl. ¶ 19) of defendants. It was signed into law by Governor McGreevey. As the District Court noted, “[t]he gravamen of [Baraka’s] complaint is that Governor McGreevey and Harrington ‘orchestrated and directed’ the New Jersey legislature to abolish the position of Poet Laureate.” Baraka v. McGreevey, No. 04-1959, slip op. at 6 (D.N.J. March 22, 2005). These actions were “an integral part of the deliberative and communicative processes,” Youngblood, 352 F.3d at 840 (quotation omitted), by which the repealer was *197 enacted, and fall squarely “ ‘within the sphere of legitimate, legislative activity.’ ” Id. at 841 (quoting Tenney, 341 U.S. at 376, 71 S.Ct. 783).
In Bogan, the Supreme Court considered whether absolute legislative immunity applied to a mayor and to a member of a city council. 523 U.S. at 47, 118 S.Ct. 966. Both officials played central roles in advocating, promoting, and passing an ordinance that eliminated a government office of which plaintiff was the sole employee. Id. In concluding absolute legislative immunity applied, the Court held the city council member’s acts of voting for the ordinance were “in form, quintessentially legislative,” and the mayor’s acts of introducing a budget and signing the ordinance into law “also were formally legislative.” Id. at 55, 118 S.Ct. 966.
Baraka contends he named Governor McGreevey as a defendant not because the Governor signed the repealer, but because he advocated and orchestrated the legislation that abolished the position of poet laureate. His argument appears to concede the Governor’s actions were central, or integral, to the legislative process. The New Jersey Constitution authorizes the Governor to “recommend such measures as he may deem desirable,” and to convene the Legislature “whenever in his opinion the public interest shall require.” N.J. Const, art. V, § 1. The New Jersey Governor, therefore, is constitutionally authorized to recommend legislative measures. Furthermore, this is consistent with the type of activity designated as “legislative” in Brewster and Youngblood. As the Governor’s appointee, Harrington’s actions in advising and counseling Governor McGree-vey and the Legislature are also legislative. See Aitehison, 708 F.2d at 99 (affording legislative immunity to an attorney who advised a city council in drafting an ordinance). Though neither Governor McGreevey nor Harrington were legislators, their actions as public officials in proposing and advocating the repealer are properly characterized as legislative.
Despite Baraka’s characterization, his cause of action also necessarily encompasses the Governor’s actions in signing the repealer into law. The position of poet laureate was eliminated by legislative re-pealer, which required gubernatorial approval (absent legislative override of a veto).[6] Governor McGreevey’s act of signing the repealer into law is properly characterized as a legislative action, like those designated in Brewster and Youngblood. See Edwards v. United States, 286 U.S. 482, 490, 52 S.Ct. 627, 76 L.Ed. 1239 (1932) (noting “the legislative character of the President’s function in approving or disapproving bills”); Smiley v. Holm, 285 U.S. 355, 372-73, 52 S.Ct. 397, 76 L.Ed. 795 (1932) (discussing a governor’s actions in signing or vetoing a bill as part of the legislative process).
2.
Baraka’s contention that defendants’ actions were administrative does not change our conclusion. As noted, Baraka contends that in abolishing the position of poet laureate, defendants targeted him for punitive action and engaged in administrative — as opposed to legislative — activity.
*198 In determining whether legislative immunity attaches to municipal actors engaging in arguably administrative activities, we ask whether the activities are “both substantively and procedurally legislative in nature.” In re Montgomery County, 215 F.3d 367, 376 (3d Cir.2000); see Carver v. Foerster, 102 F.3d 96, 100 (3d Cir.1996) (asking whether the act is “substantively legislative,” as involving “policy-making” or “line-drawing,” and “procedurally legislative,” as being “passed by means of established legislative procedures”) (quoting Ryan v. Burlington County, 889 F.2d 1286, 1290-91 (3d Cir.1989)); see also Bogan, 523 U.S. at 55, 118 S.Ct. 966 (affording legislative immunity to a non-legislator who performed functions that were substantively and procedurally legislative). In Gallas we explained this two-part inquiry:
First, the act must be “substantively” legislative, i.e., legislative in character. Legislative acts are those which involve policy-making decision [sic] of a general scope or, to put it another way, legislation involves linedrawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. In addition, the act must be “procedurally” legislative, that is, passed by means of established legislative procedures. This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve.
211 F.3d at 774 (quoting Ryan, 889 F.2d at 1290-91).[7]
Here, defendants are public officers and state actors. Our cases differ as to whether the two-part substance/procedure inquiry, first applied to municipal actors, is also appropriate for actors at the state level. In Gallas, we applied the two-part inquiry to Pennsylvania Supreme Court justices and concluded the justices were entitled to legislative immunity for their actions in reorganizing one of the state’s judicial districts. Id. But in other cases we declined to extend the two-part inquiry to state actors. See Youngblood, 352 F.3d at 841 n. 4 (“We have since recognized ... that the substance/procedure test was ‘developed for municipalities,’ where individual officials are more likely to perform a mixing of administrative and legislative functions, and thus have ‘decline[d] to extend [the Carver ] analysis ... to other levels of government.’ ”) (quoting Larsen v. Senate of the Commonwealth of Pa., 152 F.3d 240, 252 (3d Cir.1998)) (“[Bjecause concerns for the separation of powers are often at a minimum at the municipal level, we decline to extend our analysis developed for municipalities to other levels of government.”). Instead, we articulated the relevant inquiry as whether the actions in question were “within the sphere of legitimate, legislative activity.” Youngblood, 352 F.3d at 841 (quoting Tenney, 341 U.S. at 376, 71 S.Ct. 783).[8]
*199 Regardless of the level of government, we believe the two-part substance/procedure inquiry is helpful in analyzing whether a non-legislator performing allegedly administrative tasks is entitled to immunity.[9] We note that in Youngblood and Larsen — -the cases declining to apply the two-part inquiry to state actors — there was no allegation that the actions in question were administrative, and no need for this inquiry as a means of distinguishing between administrative and legislative actions. See Youngblood, 352 F.3d at 840-41; Larsen, 152 F.3d at 252. In addition, these cases addressed legislators’ actions. Gallas, in contrast, addressed non-legislators’ actions. Here, we similarly address the actions of non-legislators (Governor McGree-vey and Harrington) performing allegedly legislative tasks. In determining whether legislative immunity applies, it is relevant to ask whether Governor McGreevey’s and Harrington’s actions were both substantively and procedurally legislative. If they were, they meet the standard set by the Supreme Court — they were “in the sphere of legitimate legislative activity.” Bogan, 523 U.S. at 54, 118 S.Ct. 966 (quoting Tenney, 341 U.S. at 376, 71 S.Ct. 783).
We have already focused on the procedural nature of Governor McGree-vey’s and Harrington’s actions. We noted that their actions in recommending and, in the Governor’s case, signing the repealer were similar to those of the defendants in Bogan — actions that were “in form, quintessentially legislative.” Bogan, 523 U.S. at 55, 118 S.Ct. 966. We agreed with the District Court that “[t]he gravamen of [Baraka’s] complaint is that Governor McGreevey and Harrington ‘orchestrated and directed’ the New Jersey legislature to abolish the position of Poet Laureate.” Baraka, No. 04-1959, slip op. at 6. In sum, we concluded their actions were procedurally legislative.
Their actions in support of the repealer were also substantively legislative. This law, formally enacted, eliminated the position of poet laureate, a position that was legislatively created. Eliminating the position of poet laureate constitutes the type of “policy-making” that traditional legislation entails, and the actions here were substantively legislative. See Gallas, 211 F.3d at 774.
In the context of public employment, we have drawn a distinction between the elimination of a position and the termination of an individual employee. See id. at 775 *200 (“[T]he elimination of a public employment position — as opposed to the firing of a single individual — constitutes a ‘legislative’ act.”); Montgomery County, 215 F.3d at 377 (holding decision to terminate director of county department of housing services was administrative because “Hiring a particular employee is a personnel decision that does not involve general policy making”).
Nevertheless, Baraka contends the purpose of the repealer was to remove him specifically as poet laureate after he refused to resign, and its effect is better analogized to the termination of an individual’s employment than to the elimination of a position. Baraka contends he was punished for his speech, which his detractors termed anti-Semitic. In his view, the intent and motive behind the purpose of the repealer was perceived anti-Semitism. But a defendant’s intent and motive are immaterial to whether certain acts are entitled to legislative immunity. See Bogan, 523 U.S. at 54-55, 118 S.Ct. 966. Accordingly, Baraka’s allegation as to Governor McGreevey’s and Harrington’s intent and motive — which we accept as true in reviewing the denial of a Fed.R.Civ.P. 12(b)(6) motion — cannot affect our analysis.
In Bogan, plaintiff alleged defendants’ actions in passing an ordinance were motivated by racial animus, and were in retaliation for her exercise of First Amendment rights. See id. at 47, 118 S.Ct. 966. A jury agreed with plaintiff, finding defendants’ actions had been motivated by a desire to punish plaintiff for her constitutionally protected speech. Relying on this jury finding, the Court of Appeals for the First Circuit held that because defendants’ actions targeted plaintiff, they were not legislative. But the Supreme Court concluded the Court of Appeals “erroneously relied on [defendants’] subjective intent in resolving the logically prior question of whether their acts were legislative.” Bogan, 523 U.S. at 54, 118 S.Ct. 966. The Court explained “it simply is ‘not consonant with our scheme of government for a court to inquire into the motives of legislators.’ ” Id. at 55, 118 S.Ct. 966 (emphasis omitted) (quoting Tenney, 341 U.S. at 377, 71 S.Ct. 783). The relevant inquiry was whether, “stripped of all considerations of intent and motive, [defendants’] actions were legislative.” Id.
In Youngblood, a state representative contended two other representatives denied her adequate budget allocation for office staffing in retaliation for her complaints against their party leadership. 352 F.3d at 838. Citing Bogan we emphasized that a court does not consider intent and motive to determine whether legislative immunity applies to a defendant’s actions. Id. at 841. Defendants’ acts of allocating office-staffing appropriations among individual representatives were legislative acts to which immunity extended. Id. at 841. It was immaterial that the acts may have been intended to punish the plaintiff because “legislators’ motives are irrelevant to whether their activities enjoy legislative immunity.” Id. at 839-40; see also Gallas, 211 F.3d at 773 (“In determining whether an official is entitled to legislative immunity, we must focus on the nature of the official’s action rather than the official’s motives or the title of his or her office.”).
Baraka cites Canary v. Osborn, 211 F.3d 324 (6th Cir.2000), and Kamplain v. Curry County Board of Commissioners, 159 F.3d 1248 (10th Cir.1998), in contending an improper motive is relevant to a court’s determination of whether legislative immunity applies. But neither case supports this position. In Canary, the Court of Appeals for the Sixth Circuit concluded individual school board members were not entitled to absolute legislative immunity for their role *201 in voting against the renewal of an employee’s contract as an assistant principal. 211 F.3d at 330-31. Because they were assessing the performance and actions of an individual employee, their actions “did not have prospective implications that reach[ed] well beyond the particular occupant of the office,” and accordingly were not covered by legislative immunity. Id. at 330 (quotation omitted). In Kamplain, the Court of Appeals for the Tenth Circuit concluded defendants acted in an administrative capacity foreclosing legislative immunity when they banned plaintiffs attendance, participation, and speech at meetings of a county board of commissioners. 159 F.3d at 1252. The court concluded, “[b]ecause the circumstances of this case did not concern the enactment or promulgation of public policy, we cannot say that the bans were related to any legislation or legislative function.” Id. at 1252. Neither Canary nor Kamplain relied on defendants’ subjective intent or motive in determining whether legislative immunity applied. Both cases cited Bo-gan’s directive that “[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it.” See Canary, 211 F.3d at 329; Kamplain, 159 F.3d at 1251.
Baraka asks us to do what the Supreme Court has labeled erroneous — “rel[y] on [defendants’] subjective intent in resolving the logically prior question of whether their acts were legislative.” Bogan, 523 U.S. at 54, 118 S.Ct. 966. Governor McGreevey’s and Harrington’s subjective intent plays no role in our analysis of whether or not their acts were legislative. The relevant question is whether, “stripped of all considerations of intent and motive, [defendants’] actions were legislative.” Id. at 55, 118 S.Ct. 966. Both in form and in substance, the actions of both defendants were legislative. Accordingly, the District Court did not err in holding Baraka’s claims against them were barred by legislative immunity.
3.
Although we join in much of our dissenting colleague’s views on the structure and history of the Speech and Debate Clause, we believe modern jurisprudence has amplified and transformed our understanding of this constitutional provision.
The separation of powers doctrine, and its attendant checks and balances, under-girds the development of the speech and debate protections afforded legislators by the United States and state constitutions. The Constitution’s framers created a structure of government that would engender competition for power among the branches.
But the Constitution also establishes legislative functions for the president, quite similar to those established for the governor in the New Jersey Constitution and at issue here. Whether these legislative functions may entitle executive branch officers to absolute legislative immunity is a question the Supreme Court answered in Tenney and, more recently, in Bogan. We applied these standards in Youngblood, and we believe our decision here is consistent with both the Supreme Court’s precedent and our own.
Our dissenting colleague insists legislative immunity is intended to shield only legislators. But this view disregards modern jurisprudence and, most strikingly, undercuts the Supreme Court’s recent guidance on the issue, in Bogan, clearly extending absolute legislative immunity to a non-legislator public official (a mayor) who was integrally involved in the proposal, promotion and passage of legislation eliminating a municipal department. There the Supreme Court noted that “[a]bsolute legislative immunity attaches *202 to all actions taken in the sphere of legitimate legislative activity.” Bogan, 523 U.S. at 54, 118 S.Ct. 966 (internal quotes omitted). Later, the Court noted “[w]e have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions,” adding that an executive’s actions with respect to enacting legislation are “integral steps in the legislative process.” Id. at 55, 118 S.Ct. 966. Subsequently, we noted this extension of legislative immunity to public officials outside the legislature in our description of Bogan. See Youngblood, 352 F.3d at 840 (Bogan held “municipal officials were immune from a plaintiffs claim that the officials violated her civil rights when they enacted a budget that eliminated her position”).
If our dissenting colleague’s concern is that legislative immunity would be extended to basic lobbying activity, we cannot agree. This ignores the fundamentally different roles played by a governor and his appointees in the legislative process from those played by a private party who lobbies for legislation. As noted, the New Jersey Constitution requires the governor to play a role in enacting legislation, through signing or vetoing it. It also authorizes the governor to “recommend such measures as he may deem desirable,” and to convene the Legislature “whenever in his opinion the public interest shall require.” N.J. Const., art. V, § l.[10] These functions are integral steps in the legislative process, authorized by the state Constitution to the governor and, by extension, his appointees. No private lobbyist can claim such a constitutional authority to participate in the legislative process.
B.
Baraka contends that even if legislative immunity bars his claim for damages, it does not bar his claim for reinstatement against Governor McGreevey and Harrington in their official capacities. He notes that legislative immunity is a personal immunity defense, citing Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), for the proposition that personal immunity defenses are unavailable in official-capacity actions.
In Kentucky, the Court noted in dicta, “[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment.” Id. at 167, 105 S.Ct. 3099. Kentucky addressed whether a plaintiff— who prevailed in a suit against a governmental entity’s employees in their personal capacities — could recover attorneys’ fees from the entity. Id. at 161, 105 S.Ct. 3099. It did not involve, as does this case, a claim for injunctive or declaratory relief. Accordingly, the case has limited relevance to determining whether legislative immunity bars Baraka’s claim for reinstatement.
Moreover, in Larsen, we interpreted the Supreme Court’s opinion in Supreme Court of Virginia v. Consumers Union to hold that at least in “appropriate cases,” legislative immunity can apply to claims for declaratory and injunctive relief against officials in their official capacities.[11] See Larsen, 152 F.3d at 253; Con *203 sumers Union, 446 U.S. at 732, 100 S.Ct. 1967. In determining whether a Pennsylvania Supreme Court justice’s § 1983 claim for reinstatement against state senators who impeached him was an “appropriate case,” we asked “whether Larsen’s request for prospective relief from the Senators could be accorded consistent with the policies underlying legislative immunity.” Id. Because Larsen sought “reinstatement — nothing less than that the individual senators rescind their guilty, vote on this impeachment,” we concluded: “It is difficult to imagine a remedy that would more directly interfere with the role assigned exclusively to the Senators by the Pennsylvania Constitution.” Id. at 254. Accordingly, the senators were entitled to absolute legislative immunity.
Like the relief sought in Larsen, the relief sought by Baraka would infringe on the role of the New Jersey Legislature. Baraka seeks to require New Jersey legislators to rescind their votes repealing the statute and to enact legislation recreating the position. We agree with the District Court’s conclusion that this “would be inconsistent with the general policies underlying legislative immunity,” and “would seriously interfere with the role assigned exclusively to the Legislature.” Baraka, No. 04-1959, slip op. at 8-9. Debating, voting on, and passing statutes are “role[s] assigned exclusively” to the Legislature, and this case is an “appropriate case” for application of legislative immunity to a claim for prospective relief. Larsen, 152 F.3d at 254. Accordingly, the District Court did not err in concluding that Bara-ka’s request for reinstatement was barred by legislative immunity.-
C.
The District Court dismissed Baraka’s claim for the honorarium because the Legislature never appropriated funds for payment of the $10,000 provided for by § 52:16A-26.9. In the absence of an appropriation, the court held, defendants were not authorized to pay Baraka the honorarium. Accordingly, there could be no liability for withholding payment.[12] The court explained that under the Appropriations Clause of the New Jersey State Constitution, funds can only be withdrawn from the State treasury by legislative appropriation. See N.J. Const, art. VIII, § 2, par. 2 (“No money shall be drawn from the State treasury but for appropriations made by law.”); see also N.J. Stat. Ann. § 52:18-27 (West 2003) (“No money shall be drawn from the state treasury unless it has been explicitly appropriated to the purpose for which it was drawn.”). The court cited the New Jersey Supreme Court’s opinion in Camden v. Byrne, 82 N.J. 133, 411 A.2d 462, 470 (1980), for the proposition that “[t]here can be no redress in the courts to overcome either the Legislature’s action or refusal to take action pursuant to its constitutional power over state appropriations.” The court rejected Baraka’s contention that section 52:16A-26.9 vested in him a constitutionally protected property interest that overcame this mandate.
*204 Under New Jersey law, a statute that devotes state revenue to a particular purpose needs a corresponding appropriation authorizing payment, and a court cannot compel the appropriation. Camden, 411 A.2d at 470. In Camden, municipalities challenged the State’s failure to appropriate and expend funds in accordance with certain statutes that purported to devote tax revenues to local governments. The municipalities requested a court order requiring the legislature to make the necessary appropriations. Id. at 466. The court held the Appropriations Clause “firmly interdicts the expenditure of state monies through separate statutes not otherwise related to or integrated with the general appropriation act governing the state budget for a given fiscal year.” Id. at 468. Furthermore, even if the requesting party could prove a statutorily defined substantive right, a court could not compel an appropriation. Id. at 469 (citing Amantia v. Cantwell, 89 N.J.Super. 7, 213 A.2d 251 (1965)); see also New Jersey Div. of Youth & Family Serv. v. D.C., 118 N.J. 388, 571 A.2d 1295, 1301 (1990) (“There can be no redress in the courts to overcome either the Legislature’s action or refusal to take action pursuant to its constitutional power over state appropriations .... That principle applies even if a party is clearly entitled to compensation.”).
Based on the timing of the appropriations process, Baraka contends the lack of an appropriation is immaterial to whether he was entitled to the honorarium. He notes that in 1999—when the Legislature created the position of poet laureate—it appropriated $10,000 to pay the first person who held the position. Since the first poet served for two years starting in early 2000, further appropriation was not needed until late 2002, when the next poet (Baraka) was appointed. At this time, the Legislature had already adopted the State budget for fiscal year 2002-2003. Baraka contends that had the position of poet laureate not been abolished in July, the appropriation would have been made in the budget for fiscal year 2003-2004. But whether the Legislature’s failure to appropriate funds was intentional or the result of indifference or oversight, the absence of an appropriation is determinative. Regardless of the legislative intent, § 52:16A-26.9 could not authorize payment of the honorarium in the absence of a corresponding appropriation of state revenue. Baraka’s assertion that “it is undisputed that [defendants] refused to pay Baraka the $10,000 guaranteed by the statute” is inaccurate because it implies defendants were authorized to make a payment but chose not to do so.
? appears to be an exception to the general rule requiring a legislative appropriation. If there is a constitutional right to payment, a court may compel payment even in the absence of an appropriation. See Youth & Family Serv., 571 A.2d at 1301; Robinson v. Cahill, 69 N.J. 133, 351 A.2d 713 (1975). In New Jersey Division of Youth and Family Services, the issue was whether the New Jersey Supreme Court could require the legislature to disburse state funds to pay attorneys— appointed to represent indigent parents and their minor children—who were clearly entitled to compensation. The court qualified the principle that “[t]here can be no redress in the courts to overcome either the Legislature’s action or refusal to take action pursuant to its constitutional power over state appropriations,” by noting an exception “when funds are constitutionally mandated.”[13] Youth & Family Serv., 571 *205 A.2d at 1301. Because the attorneys had no constitutional right to compensation, the court concluded the absence of a legislative appropriation was fatal to their claims. Here, whether the absence of an appropriation is fatal to Baraka’s claims depends on whether payment of the honorarium was constitutionally mandated.
D.
Baraka contends payment of the honorarium was constitutionally mandated because New Jersey law vested in him constitutionally protected property and liberty interests when he was appointed to the position of poet laureate. He claims he was denied these interests without due process of law when the position was abolished and the $10,000 honorarium withheld.
In evaluating a procedural due process claim, we first determine “whether the asserted individual interests are encompassed within the fourteenth amendment’s protection of life, liberty, or property.” Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir.2000) (quotations omitted). Property interests are “created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.” Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). “To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.” Id.
“[T]he types of interests protected as ‘property’ are varied and, as often as not, intangible, relating ‘to the whole domain of social and economic fact.’ ” Logan v. Zimmerman Brush Co., 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (quoting Nat. Mut. Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting)). For example, individuals can have protected property interests in positions of public employment. See Roth, 408 U.S. at 576-77, 92 S.Ct. 2701 (“[A] public college professor dismissed from an office held under tenure provisions and college professors and staff members dismissed during the terms of their contracts have interests in continued employment that are safeguarded by due process.”) (internal citations omitted); see also Slochower v. Bd. of Higher Educ., 350 U.S. 551, 559, 76 S.Ct. 637, 100 L.Ed. 692 (1956); San Filippo v. Bongiovanni, 961 F.2d 1125, 1134-35 (3d Cir.1992). Baraka does not contend his protected property interest is based on an employment relationship with the State, nor would he succeed if he did. As poet laureate he was a state appointee — not an employee.[14] Rather, he contends *206 § 52:16A-26.9 created a “mutual understanding” with the State, which gave rise to a constitutionally protected property interest. He alleges both he and the State understood he was legally entitled to the honorarium.
Baraka cites Stana v. School District of Pittsburgh, 775 F.2d 122 (3d Cir.1985), for the proposition that a mutual understanding can give rise to property interests. In Stana, we explained, “[property interests ... can also arise from written or unwritten state or local government policies or from ‘mutually explicit understandings’ between a government employer and employee.” Id. at 126. But we clarified “[i]n all cases, the relevant inquiry is whether the claimant has a ‘legitimate claim of entitlement.’ ” Id. (quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701). Furthermore, the “mutually explicit understanding” in Stana grew out of an employment relationship. In holding a school employee’s place on an employment eligibility list constituted a protected property interest, we accepted plaintiffs argument that the school district’s policy for maintaining the list created a “ ‘mutually explicit understanding’ that a person who earned a place on the eligibility list will not be removed from the list for four years.” Id. at 126. We noted the Supreme Court had “ ‘frequently recognized the severity of depriving a person of the means of livelihood,’ ” id. at 128, and reasoned that Stana’s interest in remaining on the list was analogous to the plaintiffs’ employment interests in Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), where the Supreme Court referred to “ ‘the significance of [an employee’s] private interest in retaining employment.’ ” Stana, 775 F.2d at 128 (quoting Loudermill, 470 U.S. at 543, 105 S.Ct.1487). The employment relationship was central to our decision in Stana. Because Baraka did not hold a position of public employment, Stana is inapposite.
Furthermore, § 52:16A-26.9 shows no sign of a “mutually explicit understanding” that Baraka was entitled to the honorarium upon accepting the appointment. The statute provided for payment of an honorarium to the poet laureate, who, during a two-year period, would “engage in activities to promote and encourage poetry within the State.” N.J. Stat. Ann. § 52:16A-26.9(d). The statute did not provide the poet laureate would receive the honorarium upon appointment. Nor did it provide the poet laureate would be entitled to the honorarium whether or not he completed his term.
Terms in New Jersey statutes not otherwise defined are to be given their generally accepted meanings. N.J. Stat. Ann. *207 §1:1-1. An honorarium is generally defined as “an honorary payment or reward usually given as compensation for services on which custom or propriety forbids any fixed business price to be set or for which no payment can be enforced at law.” Webster’s Third International Dictionary (Unabridged) (1981); see also Oxford English Dictionary (2d ed.1989) (defining an honorarium as “an honorary reward”). The statute did not create a “mutually explicit understanding” that Baraka was legally entitled to the honorarium upon appointment, giving rise to a property interest.
Nor did § 52:16A-26.9 create a contractual obligation giving rise to a property interest. As the District Court noted, “absent some clear indication that the legislature intends to bind itself contractually, the presumption is that ‘a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.’ ” Baraka, No. 04-1959, slip op. at 11 (quoting Nat’l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66, 105 S.Ct. 1441, 84 L.Ed.2d 482 (1985)). The language of § 52:16A-26.9 does not demonstrate an intent on the part of the State to bind itself contractually. The statute provides “[t]he poet laureate shall receive an honorarium.” § 52-.16A-26.9. “Honorarium” implies a voluntary payment and not a contractual obligation. We see nothing in the statute demonstrating the state intended to enter a formal contract with Baraka.
In a different context, the Supreme Court held that if there is no obligation to pay a benefit, there can be no legitimate claim of entitlement to the benefit. In American Manufacturers Mutual Insurance Company v. Sullivan, the Supreme Court held that because the Pennsylvania Workers Compensation Act entitles an employee with a valid claim to payment for “reasonable” and “necessary” medical treatment, “disputes over the reasonableness and necessity of particular treatment must be resolved before an employer’s obligation to pay — and an employee’s entitlement to benefits — arise.” 526 U.S. 40, 60, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (emphasis in original). Until the employee has a legitimate claim of entitlement to the benefit, there can be no constitutionally protected property interest. Here, too, because defendants were not obligated to pay — and Baraka was not entitled to receive — the honorarium, there can be no constitutionally protected property interest.
Moreover, even if the statute did create a contractual obligation, it would not confer a constitutionally protected property interest on Baraka. Only certain state contracts create protected property interests under the Fourteenth Amendment. See Unger v. Nat’l. Residents Matching Program, 928 F.2d 1392, 1397-98 (3d Cir.1991). Generally, the two types of contracts that create protected property interests are those that confer a protected status — those “ ‘characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits’ ” — and those where “ ‘the contract itself includes a provision that the state entity can terminate the contract only for cause.’ ” Linan-Faye Const. Co., Inc. v. Hous. Auth. of Camden, 49 F.3d 915, 932 (3d Cir.1995) (quoting Unger, 928 F.2d at 1399).
Here, the right Baraka alleges the statute conferred — an honorarium — is neither a benefit on which Baraka relies in his daily life, nor a contract terminable only for cause. At most, § 52:16A-26.9 provided Baraka with a “unilateral expectation” *208 of a voluntary award. Roth, 408 U.S. at 577, 92 S.Ct. 2701. It did not provide him with a “legitimate claim of entitlement.” Id. Nor is an honorarium a form of property on which he would rely in his daily life. See id. (“It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.”).
Baraka also contends he has a constitutionally protected interest in his reputation, of which he was deprived when his position was eliminated.[15] He alleges defendants caused “irreparable damage to his reputation, embarrassment, humiliation and emotional distress.” Reputational harm can constitute a protected interest when coupled with an additional deprivation of a protected right or interest.[16] See Paul v. Davis, 424 U.S. 693, 711-12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding reputation alone is not a constitutionally protected property or liberty interest); see also Graham v. City of Philadelphia, 402 F.3d 139, 142 (3d Cir.2005); Kelly v. Borough of Sayreville, N.J., 107 F.3d 1073, 1077-78 (3d Cir.1997). In Paul, the Supreme Court noted that its case law did “not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either ‘liberty’ or ‘property’ by itself sufficient to invoke the procedural protection of the Due Process Clause.” Paul, 424 U.S. at 701, 96 S.Ct. 1155. We have noted some confusion whether the additional “more tangible interest” must be “a protectible property interest,” or whether “something less than a property interest, independently protected by the Due Process Clause, could be [] sufficient.” Ersek v. Twp. of Springfield, 102 F.3d 79, 83 n. 5 (3d Cir.
*209 1996); see Graham, 402 F.3d at 142 n. 2. We need not decide the issue here. Bara-ka has pled no additional deprivation of a protected interest to couple with the alleged injury to his reputation.[17] On a Fed. R.Civ.P. 12(b)(6) motion, we accept his allegations of reputational harm as true, but we conclude he has not stated an actionable claim for deprivation of a constitutionally protected interest in his reputation.
E.
Baraka also contends the District Court erred by “completely ignor[ing]” the deprivation of his liberty interest. He alleges defendants deprived him of his position and of the honorarium to punish him for his views, depriving him of a liberty interest without due process of law.
The liberty interests protected by procedural due process are broad in scope, including
not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.
Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Harm to reputation can, in certain circumstances, constitute deprivation of a liberty interest. See Paul, 424 U.S. at 711, 96 S.Ct. 1155. But as noted, Baraka has not properly alleged a protected interest in his reputation. Baraka has not identified a protected liberty interest of which he was deprived. Denial of continued public employment can also constitute deprivation of a liberty interest. See Roth, 408 U.S. at 573, 92 S.Ct. 2701. But Baraka was not employed by the state. Accordingly, the District Court did not err in declining to address his free speech claim separately from his claim of a constitutionally protected property interest.
Nor can Baraka properly state a First Amendment retaliation claim. Bara-ka contends he was denied a benefit — the $10,000 honorarium — in retaliation for his First Amendment expression. But Bara-ka cannot state a viable claim that defendants denied him the honorarium to punish him for his views when defendants *210 were not legally authorized to pay the honorarium because no appropriation was ever made. Accordingly, Baraka does not state a cognizable First Amendment claim. The District Court did not err in holding defendants did not deprive Baraka of a constitutionally protected property or liberty interest, or infringe upon his First Amendment rights.
F.
The District Court dismissed Baraka’s claims against various unknown government defendants because Baraka did not allege they engaged in specific behavior that contributed to his harm. Furthermore, the District Court held that because there is no respondeat superior liability under § 1983, the named defendants could not be held liable for the actions of the unknown defendants. A defendant in a civil rights action “must have personal involvement in the alleged wrongs to be liable,” Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir.2003) (quotation omitted), and “cannot be held responsible for a constitutional violation which he or she neither participated in nor approved,” C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir.2000). Baraka does not allege specific, personal involvement on the part of the unknown defendants, and, accordingly, the District Court did not err in dismissing the claims against them.
Baraka contends “the Complaint clearly alleges that these [defendants] were part of ‘a concerted campaign ... to remove or terminate [him] from his state position.’ ” In his reply brief, he adds “more detail will be possible” once he “is able to obtain discovery to shed light on Defendants’ actions.” Baraka’s vague references to the conduct of the unknown defendants are insufficient to constitute allegations that state a claim.
Moreover, Baraka’s claims against the unknown defendants are barred by the Eleventh Amendment to the extent defendants are either state agencies or state officials sued in their official capacities. See Will v. Mich. Dep’t of State Police, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); M.A. ex rel. E.S. v. State-Operated Sch. Dist. of Newark, 344 F.3d 335, 345 (3d Cir.2003). His claims are barred by the doctrine of legislative immunity to the extent the claims are based on the involvement of these unidentified defendants in the passage of the legislation abolishing the position of poet laureate.
G.
Baraka contends the District Court erred in declining to exercise pendent jurisdiction over his state law claims. The District Court noted “[w]here the federal claims are dismissed before trial, ‘the district court must decline to decide pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.’ ” Baraka, No. 04-1959, slip op. at 12 (quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir.1995)).
We have held “a refusal to exercise pendent jurisdiction over a state law claim after dismissal of all federal claims prior to trial is ordinarily not an abuse of discretion.” Edelstein v. Wilentz, 812 F.2d 128, 134 (3d Cir.1987). Here, it was not an abuse of discretion for the District Court to decline to exercise pendent jurisdiction after determining the considerations weighing in favor of pendent jurisdiction were not present.
IV.
As noted, Baraka contends he was punished by the Governor and the New Jersey *211 Legislature for speaking his views — views that were perceived to be anti-Semitic. His alleged punishment consisted of the elimination of the position of New Jersey poet laureate, which Baraka then held.
On a motion to dismiss, we accept the allegations as true — any set of facts will suffice, though we are not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations. Schuylkill Energy, 113 F.3d at 417; Papasan, 478 U.S. at 286, 106 S.Ct. 2932.
This case turns not on Baraka’s First Amendment right to speak his mind, but rather on whether he had a protected legal interest — constitutional or otherwise — in the continued existence of the position of New Jersey poet laureate, and his own holding of the post.
The Library of Congress began filling a position called “Consultant in Poetry” in 1937. In 1985, Congress passed legislation that changed the title of the post to United States Poet Laureate Consultant in Poetry to the Library of Congress. 2 U.S.C. § 177. The national poet laureate receives a stipend funded by a private gift. Some states began naming their own poets laureate earlier in the century, as early as 1919.[18] A review of the history of state poets laureate reveals that of the thirty-nine states that currently have a poet laureate, twenty-nine legislatures have codified their state poet laureate position; the remaining ten positions were created by executive order of the governor. These posts are typically described as “honorary,” sometimes include a statutory provision for a modest stipend, but not always, and sometimes are left vacant. Some states have designated specific poets as poet laureate, either by executive order or legislation, and in several cases the post has run its course when its holder has died. Some states have codified a previously unofficial poet laureate post.
In summary, the position has historically been created by legislative or executive action. Thus, despite the undeniable artistic and cultural benefits of having a poet laureate, we are not aware that any state constitution requires the maintenance of the position, nor that any provision of any officially created poet laureate post protects it from appropriate official action (legislative or gubernatorial) designed to terminate it.
The New Jersey Legislature created the post of poet laureate through ordinary legislative action. The repeal of the post resulted from ordinary legislative acts by legislators and the governor. The statute contained no provision that protected it from the ordinary legislative process.
Baraka, like any person, was free to speak his views. But he had no protected legal interest in the maintenance of the position of poet laureate of New Jersey.
Y.
For the reasons set forth, we will affirm the judgment of the District Court.

. Section 52:16A-26.9, provided:
a. There is hereby established the New Jersey William Carlos Williams Citation of Merit to be presented to a distinguished poet from New Jersey who shall be considered the poet laureate of the State of New Jersey for a period of two years. The poet laureate shall receive an honorarium of $10,000.
b. The New Jersey Council for the Humanities, in consultation with the New Jersey State Council on the Arts, shall biennially appoint and convene a panel of four persons who are either distinguished poets or persons who represent a range of stylistic approaches in the field of poetry. Each member of the first such panel shall be from New Jersey. After the term of the first poet laureate and each subsequent poet laureate has expired, that person shall serve as one of the members of the panel for a period of two years and participate in the selection of the next poet laureate. The panel shall submit to the Governor the name of the poet to whom the citation of merit shall be presented and who shall be considered poet laureate of the State for the subsequent two years.
c. The Governor shall present biennially the New Jersey William Carlos Williams Citation of Merit.
d. The poet laureate shall engage in activities to promote and encourage poetry within the State and shall give no fewer than two public readings within the State each year while the poet holds the laureate designation.
e. The New Jersey Council for the Humanities, in consultation with the New Jersey State Council on the Arts, shall establish such guidelines as are deemed necessary to effectuate the purposes of this section.

. The full text of the poem is available at a Web page registered to Baraka, http://www. amiribaraka.com/blew.html (last visited on March 15, 2007).

. The bill lists nine state senators and three assembly members as sponsors, and fifteen state senators and fifty-five assembly members as co-sponsors. It passed with 21 votes and 19 abstentions in the State Senate, and it passed the Assembly in a 69-to-2 vote. Laura Mansnerus, New Jersey Assembly Votes to Cut Embattled Poet’s Job, N.Y. Times, July 2, 2003, at B2.

.On appeal, Baraka recognizes § 52:16A-26.9 provided for a single payment of $10,000 and not $10,000 per year.

. Baraka does not appeal the District Court’s holding that claims against the State, the Arts Council, and unknown government entities and employees in their official capacities were barred by the Eleventh Amendment.

. Like other state constitutions, the New Jersey Constitution grants the governor a role in the finalization of all legislation. All legislation passed by both houses of the state Legislature must be presented to the governor, who is authorized to enact the law by signing it, or to veto the law by returning it to the legislature with objections. If the governor takes no action within 45 days, the bill becomes law by default. The Legislature can override a veto only by a two-thirds super-majority in both houses. NJ. Const, art. V, § 1, par. 14.

. We further noted that in Ryan "we did not mean to imply that a legislative body, passing a de jure law affecting only a single person, would not be entitled to legislative immunity.” Gallas v. Sup.Ct. of Pa., 211 F.3d 760, 774 n. 14 (3d Cir.2000).

. In Youngblood, we found support in Bogan for our decision not to apply the two-part inquiry. We stated,
We similarly decline to apply the Carver analysis to this case, especially in light of language from the Supreme Court that, we believe, casts doubt on the propriety of using any separate test to examine municipal-level legislative immunity, see Bogan, 523 U.S. at 49, 118 S.Ct. 966, 140 L.Ed.2d 79 (holding that local legislators are "likewise” absolutely immune from suit under *199 § 1983), particularly a two-part, substance/procedure test, id. at 55, 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (refusing to require that an act must be "legislative in substance” as well as of "formally legislative character” in order to be a legislative act).
352 F.3d at 841 n. 4. But the Court in Bogan did not "refuse” to require an act be both procedurally and substantively legislative for immunity to apply. Rather, it concluded that because the acts in question were legislative in both respects, there was no need to determine whether the procedurally legislative character of the actions was “alone sufficient to entitle petitioners to legislative immunity.” Bogan, 523 U.S. at 55, 118 S.Ct. 966.
We believe Bogan’s analysis illustrates that the two-part substance/procedure inquiry provides a useful means of determining whether allegedly administrative actions meet the standard set forth by the Supreme Court— whether the actions are "in the sphere of legitimate legislative activity.” Bogan, 523 U.S. at 54, 118 S.Ct. 966 (quoting Tenney, 341 U.S. at 376, 71 S.Ct. 783). We use the substance/procedure inquiry not to establish a separate and distinct standard for certain actors, but to determine whether the Court’s standard has been met.

. In Larsen, we explained our decision not to apply the two-part inquiry to state actors. We noted, “concerns for the separation of powers are often at a minimum at the municipal level.” 152 F.3d at 252.

. The governor is additionally given broad power to grant pardons and reprieves, and to suspend and remit fines and forfeitures, powers that necessarily overlap with the powers assigned to the judicial branch of government. N.J. Const, art. V, § 2.

. We also concluded we erred in Acierno v. Cloutier when we stated “the Supreme Court has never held that legislative immunity applies to both claims for damages and injunc-tive relief.” Larsen, 152 F.3d at 252 (citing Acierno v. Cloutier, 40 F.3d 597, 607 n. 8 (3d Cir.1994) (en banc)). We recognized that "in *203 fact the Supreme Court in Consumers Union did resolve the issue of the application of absolute legislative immunity to claims for prospective relief and answered that question in the affirmative.” Id. (citing Sup.Ct. of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980)).

. Baraka states the District Court held the legislature’s failure to appropriate the $10,000 as of the date of Baraka’s appointment "retroactively nullified,” "repealed],” or "eliminat[ed]” the honorarium provided by § 52:16A-26.9. This mischaracterizes the District Court's holding. - Because the legislature had not appropriated funds to pay the honorarium, the court held defendants had no legal authority to withdraw the $10,000 from the state treasury to pay Baraka.

. The court also rejected the argument that it should find the necessary authorization in *205 general statutory appropriation clauses. The court explained:
[T]he statutory schemes for all departments, divisions, agencies and other units of State government include general-appropriation clauses. Thus, under its theory, we could always find that general-appropriation clauses enable us to compel the legislature to pay for whatever services we feel the state should provide. We are not persuaded that all general appropriation clauses necessarily give us such carte blanche.
New Jersey Div. of Youth & Family Serv. v. D. C. 118 N.J. 388, 571 A.2d 1295, 1300 (1990).

. We look to New Jersey law in determining whether Baraka was a public employee. See Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (“|T]he sufficiency of the claim of entitlement [to a property interest in employment] must be decided by *206 reference to state law.”). New Jersey courts use two different tests to determine whether an individual qualifies as an employee. See Lowe v. Zarghami, 158 N.J. 606, 731 A.2d 14, 19-20 (1999). The "control test” considers the following factors: "(1) the degree of control exercised by the employer over the means of completing the work; (2) the source of the worker's compensation; (3) the source of the worker’s equipment and resources; and (4) the employer’s termination rights.” Id. The "relative nature of the work test” considers “the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business.” Id. at 20 (quotation omitted). "Although used primarily in workers’ compensation cases,” this test is appropriate in other cases as well, such as those "involving work performed by professional employees,” and where the nature of work necessarily involves independent, professional judgment. Id. at 20-21. Under either test, Baraka was not a state employee. The State did not exercise control over his work, provide him with facilities or resources, or pay him a regular salary. Baraka was not economically dependent on the State, nor was his work central to the operation of any State business.

. Baraka contends he has a property interest in his reputation. Generally, if reputational harm implicates a constitutionally protected interest, it is a liberty interest. See Paul v. Davis, 424 U.S. 693, 711, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Kelly v. Borough of Sayreville, N.J., 107 F.3d 1073, 1077-78 (3d Cir.1997). But see San Filippo, 961 F.2d at 1134 (implying reputational harm can constitute a deprivation of a protected property interest).

. Baraka cites San Filippo for the proposition that "[wjhenever a 'person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' a property interest is involved and due process requirements apply.” 961 F.2d at 1134 (quoting Roth, 408 U.S. at 572, 92 S.Ct. 2701). In Paul, the Supreme Court recited a nearly identical statement. See 424 U.S. at 708, 96 S.Ct. 1155 (" ‘Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' ”) (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). The Court recognized this statement "could be taken to mean that if a government official defames a person, without more, the procedural requirements of the Due Process Clause of the Fourteenth Amendment are brought into play.” Id. But the Court rejected this reading, which would represent “a significant broadening” of previous cases. Id. Instead, the Court read the phrase "because of what the government is doing to him,” to refer to "the fact that the governmental action taken in that case deprived the individual of a right previously held under state law.” Id. This right was "the right to purchase or obtain liquor in common with the rest of the citizenry,” and the governmental action in question was a state statute that allowed government officials to post notices prohibiting sale of alcoholic beverages to certain people (including the plaintiff) because of their history of problems with alcohol. Id. The statute "significantly altered” the plaintiff's status under state law, and "it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards.” Id. at 708-09, 96 S.Ct. 1155. The Court’s conclusion that repu-tational harm alone cannot form the basis of a due process claim was "reinforced by our discussion of the subject” in Roth. Id. at 709, 96 S.Ct. 1155.

. Moreover, to state a valid claim for deprivation of a protected interest based on repu-tational harm, a plaintiff must allege harm that forecloses future opportunities. In Roth, the plaintiff contended harm to his reputation, resulting from the non-renewal of his contract, amounted to deprivation of a protected liberty interest. The Court acknowledged that "nonretention in one job ... might make him somewhat less attractive to some other employers.” Roth, 408 U.S. at 574 n. 13, 92 S.Ct. 2701. But it concluded this harm "would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of liberty.’ ” Id. In Unger, a plaintiff alleged harm to her reputation based on discontinuation of a university's graduate residency program, to which she had been accepted. In addressing her claim for deprivation of a protected liberty interest in her reputation, we noted she had not alleged the university's actions had "imposed upon her a stigma or other disability that generally foreclosed her freedom to take advantage of other educational opportunities.” 928 F.2d at 1396. In other words, she had not established the "kind of foreclosure of opportunities” required by Roth. 408 U.S. at 574 n. 13, 92 S.Ct. 2701; see also Ersek, 102 F.3d at 84 (discussing the requisite showing of future harm to establish deprivation of liberty based on harm to reputation). Here, Baraka alleges defendants caused "irreparable damage to his reputation, embarrassment, humiliation and emotional distress,” but he does not specifically allege a foreclosure of future opportunities.

. Detailed information on the history and current status of the poet laureate post in each state is available on the web site of the Library of Congress at: Main Reading Room, http://www.loc.gov/rr/main/poets/current.html (last visited on March 15, 2007). A history of the national poet laureate is available at: About the Position of Poet Laureate, http:// www.loc.gov/poetiy/aboutlaureate.html (last visited on March 17, 2007).